**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| JEANFRANCO ALEJANDRO FLORES SALAZAR, | ) | **Case No: 1:25-CV-11159-LTS** |
| | ) | |
| Petitioner, | ) | |
| v. | ) | |
| | ) | |
| ANTONE MONIZ, Superintendent, Plymouth County Correctional Facility, | ) | |
| | ) | |
| Respondent. | ) | |

**<u>OPPOSITION TO RESPONDENT'S MOTION TO DISMISS</u>**

Petitioner Jeanfranco Alejandro Flores Salazar, through his undersigned counsel, hereby opposes the Respondent's Motion to Dismiss his Petition for Writ of Habeas Corpus as moot.

INTRODUCTION

On March 5, 2025, Petitioner Jeanfranco Flores Salazar was sitting in a passenger seat in a parked van with six workmates when Customs and Border Protection (CBP) agents swarmed the vehicle and arrested Mr. Flores Salazar and five of the others for no apparent reason. Mr. Flores Salazar presented an obviously valid employment authorization document, that any immigration official would recognize as proof of his authorization to be in the United States. Yet, Mr. Flores Salazar was then detained at an immigration detention facility for 64 days before the Government made any effort to verify the propriety of his detention, and the Government only did so in response to Mr. Flores Salazar's request to this Court for relief.

In an effort to avoid consequences for its unlawful actions, the Government transferred Mr. Flores Salazar to a less restrictive, but still invasive, form of custody – by putting him under an

intensive order of supervision and GPS monitoring – and now claims that Mr. Flores Salazar's request for habeas relief is moot. It is not.

The law is clear that custody short of incarceration, such as the kind currently imposed on Mr. Flores Salazar, warrants habeas review. And even if the Court were inclined to agree that the Petition may be moot (and it is not), this Court can and should adjudicate the issues underlying Mr. Flores Salazar's Petition pursuant to the voluntary cessation doctrine. Granting dismissal in these circumstances would allow the Government to immunize itself from suit by unilaterally changing its behavior long enough to secure a dismissal before resuming its unlawful actions outside the view of the Court.

Without this Court's intervention, Mr. Flores Salazar is at risk of further unlawful detention by the Government, as are others who have the misfortune of encountering the government agents responsible for the misconduct perpetrated here.

## RELEVANT FACTS

### I. Newly Obtained Information Regarding Mr. Flores Salazar's Arrest by CBP on March 5, 2025

In early March 2025, Mr. Flores Salazar traveled as part of a seven-person crew to Calais, Maine, for a construction job. Pet'r's Opp'n to Resp't's Mot. to Dismiss, Exh. 2 (Declaration of Ivan Rivera) at ¶ 3. The job was supposed to take approximately one to two weeks to complete, and the crew were staying at the Calais Motor Inn in Calais, Maine for the duration of the job. *Id.* at ¶ 4. They had only worked on the job site for a day before six members of the crew were arrested by Maine CBP agents. *Id.* at ¶ 5.

On the evening of March 4, Mr. Flores Salazar and a fellow crew member named Darwin, had a drink after work at the Motor Inn's restaurant and bar. *Id.* at ¶ 6. On the morning of March 5, the crew woke up at approximately 6:30 and then climbed into their work van at approximately

7 A.M. to leave for their job site. *Id.* at ¶ 7. The van was parked in the Motor Inn parking lot and was still stationary when CBP agents approached both sides of the van. *Id.* at ¶ 8. About three CBP trucks and at least four or five agents were present. *Id.*

Some agents went up to the driver's side window and other agents came up to the passenger's side and knocked on the windows where the van was parked. *Id.* at ¶ 9. The agents asked the crew to open the side door of the van. *Id.* at ¶ 10. They then opened the door and said they needed to see everyone's identifications. *Id.* Some of the crew members were not carrying their IDs on their persons, so crew member Ivan Rivera asked if he could run back into the hotel to get them and he was allowed to do so. *Id.* Mr. Rivera returned to the van and the crew presented their documents to the agents. *Id.* at ¶ 11. The agents told them to get out of the van and said six of the crew members would have to go to the station with the officers. *Id.* at ¶ 12. The agents started taking pictures of the crew with their phones. *Id.* at ¶ 13. The agents had the crew pose in different groups while the agents laughed. *Id.* The agents later posted some of the pictures on Facebook. *Id.* at ¶ 13; *Id.*, Sub-exhibit A.

The seven crew members were held at the parking lot for approximately 45 minutes to an hour. *Id.* at ¶ 14. Then six of the crew members, all except Mr. Rivera who is a United States Citizen, were taken into custody. *Id.* Afterwards, one of the employees at the Motor Inn told Mr. Rivera that CBP agents frequent the hotel's restaurant and bar where Mr. Flores Salazar and Darwin had had a drink the night before their arrests. *Id.* at ¶ 15. Presently, at least four of the crew members who were arrested are still unaccounted for. *Id.* at ¶ 16. They may either still be in custody or they have been removed from the country. *Id.*

## II. Mr. Flores Salazar's Custody Status Since May 9, 2025

On Friday, May 9, 2025, Mr. Flores Salazar was transferred from Plymouth County Correctional Facility to the Immigration and Customs Enforcement (ICE) Field Office in Burlington, Massachusetts. Pet'r's Opp'n to Resp't's Mot. to Dismiss, Exh. 1 (Supplemental Declaration of Jeanfranco Alejandro Flores Salazar) at ¶ 1. He was held overnight in a holding cell in Burlington. *Id.* at ¶ 3. On May 10, 2025, he was outfitted with an ankle monitor, given an order of supervision, and permitted to leave the ICE Field Office to travel to his residence in Harker Heights, Texas. *Id.* at ¶ 3-5; *Id.*, Sub-exhibit A.

On May 22, 2025, Mr. Flores Salazar was required to report to the "nearest ICE office" to his residence. *Id.* at ¶ 3-5. He reported promptly to the San Antonio ICE office, the geographically closest ICE office to his residence, only to be told he actually needed to report to the Houston ICE office, over 200 miles away, and that he was now out of compliance with his order of supervision. *Id.* at ¶ 7-13. Under great stress, and without money or a car, Mr. Flores Salazar nevertheless reported to the Houston ICE office that same day. *Id.* at ¶ 12-15. In Houston, Mr. Flores Salazar was enrolled in ICE's Intensive Supervision Attendance Program (ISAP). *Id.* at ¶ 16-17; *Id.*, Sub-exhibit B.

Restrictions placed upon Mr. Flores Salazar through ISAP include, but are not limited to, the following: he may only change his address or phone number with ICE approval, he may be requested to verify his location 24 hours a day and seven days a week, he must allow ISAP personnel to enter his residence for home visits, he must report in person to the ISAP office in Houston at regular intervals (over 170 miles from his residence), he is required to abide by a pre-approved weekly schedule and notify his ISAP caseworker 24 hours in advance of any changes in his schedule, he must remain in proximity to locations where he can charge his GPS ankle monitor,

he may not travel outside of a designated area, and he must seek travel documents from the foreign government he fears persecution from. *Id.* at ¶ 17-22; *Id.*, Sub-exhibit B at 12-14, 17, 19; *Id.*, Sub-exhibit C.

Mr. Flores Salazar confirmed with his ISAP caseworker that he could travel to a specific location for work on Saturday, May 24, 2025, but then when he went there, his GPS ankle monitor vibrated, and he received a message on his phone that he was leaving the zone he was restricted to. *Id.* at ¶ 19-20. This terrified Mr. Flores Salazar and caused him to stay confined to his residence for two days until he could again confirm with the ISAP caseworker the restrictions on his travel. *Id.* at ¶ 21-22.

While under the Government's order of supervision, Mr. Flores Salazar cannot see his family out of state, he has to comply with onerous and contradictory reporting requirements, and he lives in constant fear of being re-detained for any violation of the Government's order, even if inadvertent. *Id.* at ¶ 23-28.

## III. Evidence of Other Unlawful Arrests by CBP in Maine

On April 10, 2025, at least two people with valid employment authorization documents were arrested in Maine by immigration authorities for no discernible reason. *Fuenmayor Pacheco v. Tatum, et al.*, Civil Action No. 1:25-cv-00200, Doc. 1 (D.N.H. May 27, 2025).[1] At least one of those arrested is still detained. *Id.* In March 2025, press reported on another mass arrest by CBP in Maine, where at least one person with valid authorization to be present in the United States was detained. Pet'r's Opp'n to Resp't's Mot. to Dismiss, Exh. 3 (Bangor Daily News Article).

[1] Petitioner respectfully asks this Court to take judicial notice of the cited docket pursuant to F.R. Evid. 201.

APPLICABLE LAW

The doctrine of mootness follows from Article III, section 2 of the U.S. Constitution which limits the jurisdiction of federal courts "to those claims that involve actual 'cases' or 'controversies.'" *Redfern v. Napolitano*, 727 F. 3d 77, 83 (1st Cir. 2013). Article III Courts are not allowed to issue advisory opinions, and "[w]hen a case is moot—that is, when the issues presented are no longer live or when the parties lack a [legally] cognizable interest in the outcome—a case or controversy ceases to exist, and dismissal of the action is compulsory" unless an exception to mootness applies. *See id.* at 83-84; *Harris v. Univ. of Massachusetts Lowell*, 43 F.4th 187, 192 (1st Cir. 2022).

Recognized exceptions to mootness include the doctrine of voluntary cessation. "[T]he voluntary cessation exception exists 'to stop a scheming defendant from trying to immunize itself from suit indefinitely by unilaterally changing its behavior long enough to secure a dismissal and then backsliding when the judge is out of the picture—repeating this cycle until it achieves all its unlawful ends.'" *Lowe v. Mills*, 718 F. Supp. 3d 69, 79 (D. Me. 2024) (quoting *Boston Bit Labs, Inc. v. Baker*, 11 F. 4th 3, 10 (1st Cir. 2021)). The exception is applicable "when a defendant voluntarily ceases the challenged practice in order to moot the plaintiff's case and there exists a reasonable expectation that the challenged conduct will be repeated after the suit's dismissal." *See id.* However, the voluntary cessation exception "does not apply if the change in conduct is unrelated to the litigation." *Id.* The burden is on the party claiming mootness to show that the exception does not apply, and that burden is "formidable." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 190 (2000) ("a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely

clear the allegedly wrongful behavior could not reasonably be expected to recur"); *Lowe*, 718 F. Supp. at 79.

Although there is no singular test for what constitutes "custody" within the meaning of the habeas statutes, it is well established that various restrictions on liberty short of detention merit habeas review. *Ali v. Napolitano*, No. CIV.A. 12-11384-FDS, 2013 WL 3929788, at *3 (D. Mass. July 26, 2013).

ARGUMENT

The Government has claimed that once it realized the error of its ways, it released Mr. Flores Salazar from custody and by so doing has made his Petition for Writ of Habeas Corpus moot. It did not, and it has not. The Government's claim ignores the highly restrictive order of supervision which conditions Mr. Flores Salazar's release and which keeps him in custody within the meaning of the law; the authorities on which the Government relies are not to the contrary.

Yet even if the Court is inclined to agree that the Petition may be moot, this Court can and should adjudicate the issues underlying Mr. Flores Salazar's Petition pursuant to the voluntary cessation doctrine.

**I. Mr. Flores Salazar's Petition is not moot while he remains in custody.**

Despite Mr. Flores Salazar's release from Plymouth County Correctional Facility, he remains in the custody of the United States Government under a highly restrictive order of supervision.

The law is clear that circumstances short of incarceration may constitute sufficient custody to warrant habeas review. *Ali*, 2013 WL 3929788, at *3. The Supreme Court has deemed the custody requirement of the habeas statutes to be satisfied where a petitioner was on parole, *Jones v. Cunningham*, 371 U.S. 236, 243 (1962), released on bail awaiting trial, *Hensley v. Mun. Ct., San*

*Jose Milpitas Jud. Dist., Santa Clara Cnty., California*, 411 U.S. 345, 351-53 (1973), or on military reserve status, *Strait v. Laird*, 406 U.S. 341, 345–46 (1972). Where a petitioner is subject to control over where and when he can travel, where he can reside, with whom he can associate, what information he may keep confidential, and the type of employment in which he can engage, he is in custody. *Ali*, 2013 WL 3929788, at *4; *see also*, Resp't's Mem. of Law in Supp. of Mot. to Dismiss as Moot, Doc. 15-1 at 5 (citing *Ali*).

The Government contends that "Petitioner is free to travel, determine where he wants to reside, associate with whomever, and pursue what employment he can engage in." Doc. 15-1 at 5. This is misleading at best. Mr. Flores Salazar has been placed under an order of supervision, outfitted with a GPS ankle monitor, and required to enroll in ICE's Intensive Supervision Appearance Program (ISAP). According to the ISAP agreement which Mr. Flores Salazar was required to sign and the representations of his ISAP caseworker, Mr. Flores Salazar is subject to the following mandates: he may only change his address or phone number with ICE approval, he may be requested to verify his location 24 hours a day and seven days a week, he must allow ISAP personnel to enter his residence for home visits, he must report in person to the ISAP office in Houston at regular intervals (over 170 miles from his residence), he is required to abide by a pre-approved weekly schedule and notify his ISAP caseworker 24 hours in advance of any changes in his schedule, he must remain in proximity to locations where he can charge his GPS ankle monitor, he may not travel outside of a designated area, and he must seek travel documents from the foreign government he fears persecution from.

Mr. Flores Salazar has already received confusing and contradictory instructions, causing him to fear being accused of violating the terms of the order of supervision and the terms of the ISAP, despite his best efforts to comply with all instructions provided him and despite his efforts

to seek clarification of those instructions. Mr. Flores Salazar's current custody status is analogous to the custody endured by the Petitioner in *Jones*. There the Supreme Court found the petitioner merited habeas relief when "Petitioner must not only faithfully obey these restrictions and conditions but he must live in constant fear that a single deviation, however slight, might be enough to result in his being returned to prison to serve out the very sentence he claims was imposed upon him in violation of the United States Constitution." *Jones*, 371 U.S. at 242.

Mr. Flores Salazar, who maintains that the Government lacks any authority to hold him in custody, retains a cognizable interest in obtaining relief from these restrictions. *See D.H.L. Associates, Inc. v. O'Gorman*, 199 F. 3d 50, 54 (1st Cir. 1999). Thus, his request for habeas relief remains an active controversy that is not moot.[2]

**II. Respondent's voluntary cessation of its misconduct does not render the case moot.**

Even if the Government could establish threshold mootness (and it cannot), the Government must further prove that the voluntary cessation exception to mootness does not apply here. *See Lowe*, 718 F. Supp. 3d at 79. The Government's evidence and representations to date fall far short of that burden.

[2] The District Court cases Respondent cites either do not address the definition of custody, are easily distinguishable, or support Mr. Flores Salazar's position. Most of the cases cited are merely docket entries that do not indicate the petitioners were subject to any conditions post-release. *See Ali v. Smith*, Civil Action No. 17-11689-GAO, Document No. 9 (Jan. 1, 2018); *Lopez v. Souza*, Civil Action No. 18-10603-RGS, Document No. 8 (April 20, 2018), *Fernandez v. Moniz et al*, Civil Action No. 18-10057-WGY, Document No. 11 (Feb. 5, 2018); *Verde-Llanes v. Moniz*, Civil Action No. 17-11894-LTS, Document No. 18 (Jan. 17, 2018); *Long v. McDonald*, Civil Action No. 17-10397, Document No. 15 (March 27, 2017); *Van Dang v. McDonald,* Civil Action No. 17-12293-RGS, Document No. 9 (Dec. 18, 2017). In *Castaneda v. Souza* and *Lemonious v. Streeter*, the relief sought was a bond hearing, so conditions of release were an appropriate alternative to the relief sought. 952 F. Supp. 2d 307, 309 (D. Mass. 2013); 2020 WL 3713032 at *1 (D. Mass. 2020). In contrast, Mr. Flores Salazar contends that any form of custody is unlawful in his circumstance. In *López López v. Charles*, the petitioner was considered to be in custody while released on an order of supervision, and the petition was dismissed on other grounds not relevant to Mr. Flores Salazar's claims. 2020 WL 419598 at *4 (D. Mass. 2020)

Respondent has asserted that its unprompted arrest and two-month detention of Mr. Flores Salazar was pure administrative error – nothing more than an honest mistake – but Respondent's own conduct belies the truth of this claim. The Government avers that it arrested Mr. Flores Salazar on March 5 because "he did not have any documentation on his person that would allow him to be admitted to or remain in the United States." Resp't's Response to the Court's Order to Explain the Basis for Pet'r's Arrest and Detention (Resp't's Response), Doc. 16, ¶ 3. This is difficult to credit. Mr. Flores Salazar presented CBP agents with his government-issued, unexpired employment authorization document (EAD). Pet'r's Pet. for Writ of Habeas Corpus (Pet.), Doc. 1, ¶ 36, Pet. Exh. 1 (Declaration of Jeanfranco Alejandro Flores Salazar), ¶ 21, Sub-exhibit C. That document, on its face, includes a written designation of the basis for his work authorization, here an authorization under category (c)(11). *Id.* at Pet., Doc. 1, Exh. 1, Sub-exhibit C. The (c)(11) designation indicates that Mr. Flores Salazar was a public interest parolee. *See* U.S. Citizenship and Immigration Services (USCIS) Form I-765 Instructions at 12, ¶ 6, employment authorization categories summarized at https://www.uscis.gov/employment-authorization. His work authorization was not due to expire until July 2026, concurrent with the expiration of his parole. Pet., Doc. 1, ¶ 29, Exh. 1, Sub-exhibit C. In the absence of any reasonable suspicion of a violation of our laws – of which the Government has alleged none – this was enough to make it abundantly clear to the arresting officers that Mr. Flores Salazar was lawfully present in the United States at the time of his arrest.

The Government next claims that it was only on May 8, 2025 – nine days *after* Mr. Flores Salazar filed the instant Petition for Writ of Habeas Corpus and a full sixty-four days after he was first detained – that it reviewed his "immigration and custody history" and "subsequently realized that Petitioner was in a parole status at the time of his arrest." Resp't's Response, Doc. 16, ¶ 9.

This was not happenstance. The Government admits that it only conducted this review "due to the information contained in the habeas petition." *Id*. Even assuming the Government arrested Mr. Flores Salazar in error in the first place, there is no plausible explanation for why it took the Government two additional months to verify whether its arrest and continued detention of Mr. Flores Salazar was lawful. Nothing in the record before the Court explains this delay.

Lastly, if it were true that the Government's arrest and detention were the result of pure error, then the Government should have restored Mr. Flores Salazar to his *status quo ante* prior to his arrest. The Government has not done so. While it released Mr. Flores Salazar from the facility where he had been held, it only did so pursuant to the ISAP agreement discussed above, one of the most (if not the most) restrictive forms of continued supervision the Government has at its disposal. Under this order, among various other burdensome requirements, Mr. Flores Salazar is required to wear a GPS monitoring device at all times and is required to present himself for regular check-ins with ICE personnel. His first check-in was scheduled for May 22, 2025. When Mr. Flores Salazar presented himself at the nearest ICE field office in San Antonio, he was told that wasn't going to be good enough and that he had to make it to the ISAP office in Houston, three and a half hours away, before the end of the day.

Nothing the Government has done suggests this was all a misunderstanding. Indeed, recent reports of Maine CBP's activity suggest that others have been targeted by the same problematic conduct. Far more likely, and indeed as Respondent itself admits, is that the Government only released Mr. Flores Salazar because he filed the instant Petition and the Court took notice. Such behavior falls squarely within the voluntary cessation exception. *Contrast with ACLU of Massachusetts*, 705 F. 3d at 55 ("the voluntary cessation exception is not invoked when the challenged conduct ends because of an event that was scheduled before the initiation of the

litigation, and is not brought about or hastened by any action of the defendant”). It is the Government’s burden to prove otherwise. *Lowe*, 718 F. Supp. 3d at 79; *Friends of the Earth*, 528 U.S. at 170 (“The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness”).

The risk which animates the voluntary cessation exception is present in force here. The purpose of the exception is to prevent a defendant from simply altering its behavior “long enough to secure a dismissal” before resuming its misconduct until it can achieve its desired end. *See Lowe*, 718 F. Supp. 3d at 79. In subjecting Mr. Flores Salazar to continuous GPS monitoring, mandating regularly scheduled check-ins, restricting his travel, and imposing numerous reporting requirements, the Government has shown no sign of leaving Mr. Flores Salazar to his own devices. Instead, Respondent appears poised to re-detain Mr. Flores Salazar at its leisure once it is no longer under the judicial microscope. Indeed, Mr. Flores Salazar does not have to look far for a reason to believe the Government intends this result: when he was arrested on March 5, CBP officers similarly arrested five of his other crew members, and of those five, four are either still in custody or have already been removed from the United States. Should the instant Petition be dismissed without a ruling from the Court on the merits of the Government’s conduct, there will be little to prevent the Government from detaining Mr. Flores Salazar anew – and this time learning from its mistakes to further shield itself from review. The voluntary cessation exception exists to prevent that very outcome.

CONCLUSION

WHEREFORE, Petitioner Jeanfranco Flores Salazar respectfully requests that the Court deny the Respondent’s Motion to Dismiss and that it grant his Petition for Writ of Habeas Corpus.

Respectfully submitted,

JEANFRANCO ALEJANDRO FLORES SALAZAR,

By his attorneys,
Northeast Justice Center,

Dated: May 30, 2025

/s/ Lindsay Kramer Custer

Lindsay Kramer Custer, BBO # 705259
Northeast Justice Center
50 Island Street, Ste. 203B
Lawrence, MA 01840
(978) 888-0625
lkcuster@njc-ma.org

Dated: May 30, 2025

/s/ Claire Maguire

Claire Maguire, BBO # 709426
Northeast Justice Center
181 Union Street, Ste. 201B
Lynn, MA 01901
(978) 888-0661
cmaguire@njc-ma.org

CERTIFICATE OF SERVICE

I, Claire Maguire, hereby certify that I this date served the foregoing Opposition by filing the same with the Court's ECF electronic filing system and by so doing served the Opposition on all registered participants to this action, including counsel for Respondent.

Dated: May 30, 2025 /s/ Claire Maguire