UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JEANFRANCO ALEJANDRO FLORES SALAZAR,<br>  Petitioner,<br><br>v.<br><br>ANTONE MONIZ,<br>  Respondent. | Civil No. 25-11159-LTS |

ORDER ON MOTION TO DISMISS (DOC. NO. 15) AND
PETITION FOR WRIT OF HABEAS CORPUS (DOC. NO. 1)

June 11, 2025

SOROKIN, J.

      Jeanfranco Alejandro Flores Salazar spent sixty-five days in immigration detention before being released subject to location monitoring and intensive supervision, which continues to this day. These limitations on his liberty occurred despite decisions by immigration officials just last summer granting him temporary parole status in the United States for humanitarian reasons, along with work authorization; despite Flores Salazar's compliance with the terms of his parole; despite his lack of any criminal record; despite his production of a valid, unexpired, government-issued work-authorization card to Border Patrol agents who encountered him in Maine; and, as it turns out, despite the absence of any lawful reason to detain him. The government concedes that his detention was the result of "error" and "oversight." His release from the Plymouth County Correctional Facility ("PCCF") on various conditions came about only after—and because—he filed the pending federal habeas petition. In these circumstances, and for reasons the Court will explain in more detail below, the respondent's Motion to Dismiss is DENIED, and Flores Salazar's petition is ALLOWED.

I. BACKGROUND[1]

Flores Salazar, a citizen of Venezuela, alleges that fear of political persecution in his home country led him to flee to Peru in 2018. Doc. No. 1-1 at 2.[2] Still in search of safety, he traveled to Monterrey, Mexico, arriving in October 2023. Id. at 2–3. He hoped to seek asylum in the United States. Id. at 2. To that end, he requested an appointment with U.S. Customs and Border Patrol ("CBP") through an online government platform. Id. at 3. He then waited for nearly nine months in Mexico until he was assigned an appointment date. Id. He did not cross the border into the United States until that date arrived. See id. On July 18, 2024, Flores Salazar presented himself at the Brownsville-Matamoros port of entry along the Texas border, following the directions provided by CBP. Id. When interviewed by CBP upon arrival, he expressed his fear of persecution and his intent to seek asylum. Id. CBP initiated removal proceedings by issuing Flores Salazar a Notice to Appear ("NTA") in immigration court in Chelmsford, Massachusetts, a few months later, and instructed Flores Salazar to apply for asylum within a year. Id.; Doc. No. 23-1 at 7.

Noting that Flores Salazar had no criminal history nor any past immigration violations, CBP on that same date paroled him into the United States pending asylum proceedings. See Doc. No. 23-1 at 6; see also 8 U.S.C. § 1182(d)(5)(A) (permitting temporary parole "on a case-by-case basis for urgent humanitarian reasons or significant public benefit" of persons seeking admission to the United States). Shortly thereafter, U.S. Citizenship and Immigration Services ("USCIS") approved Flores Salazar's application for temporary employment authorization for a

---

[1] The Court's recitation of the facts is based on its review of the parties' papers, the documentary evidence, testimony offered at the evidentiary hearing, and credibility and factual determinations the Court has made in light thereof.
[2] Citations to "Doc. No. __ at __" refer to the document and page numbering in the header appended to each document by the Court's electronic docketing system.

period coincident with his parole.  Doc. No. 23-1 at 10.  USCIS then issued him a work-authorization card bearing his photograph, name, gender, date and country of birth, USCIS identification number, and "category" designation of "C11."  Doc. No. 1-1 at 12.  The category corresponds to a section of a federal regulation that governs work authorization to persons "paroled into the United States temporarily for urgent humanitarian reasons or significant public benefit."  8 C.F.R. § 274a.12(c)(11); see USCIS, Instructions for Form I-765 at 1, 12 (Jan. 20, 2025), https://www.uscis.gov/sites/default/files/document/forms/i-765instr.pdf [https://perma.cc/T4JY-Z9V7] (specifying that only people "within one of the eligibility categories below" may apply for employment authorization, and listing "Parole—(c)(11)" among such categories).  The work-authorization card is facially valid from August 12, 2024, through July 17, 2026.  Doc. No. 1-1 at 12.  Flores Salazar also obtained a Social Security number.  Doc. No. 1-1 at 4.

In October 2024, Flores Salazar appeared in immigration court as required, then moved to Florida and requested that his immigration proceedings to be transferred there.  Doc. No. 1-1 at 3–4.  Both the relocation and the case transfer were approved.  Id.  He found work with a construction company, which placed him on a crew sent to worksites in different states.  Id. at 4.  In early March 2025, the crew was sent to Maine for a job in an area near the Canadian border.  Id.  On March 4, unbeknownst to Flores Salazar, a "concerned citizen of Calais, Maine," contacted CBP to report "a black van with [an] Indiana License Plate . . . transporting approximately seven possible illegal aliens" at a gas station in Calais.  Doc. No. 23-1 at 23.  Two CBP agents responded but did not locate the van.  Id.  The next morning, "the same information was relayed," presumably via another call to CBP saying "that the van was parked at the Calais Motor Inn."  Id.  The same two agents responded and eventually approached when men were seen leaving the motel and loading into the van.  Id.

One of the six men in the van was a United States citizen; he identified the other five men as his employees, and all of them cooperated with the agents.  Id.  Flores Salazar and three of the other men produced valid work-authorization cards.  Id.  Nevertheless, all of the noncitizens were arrested and taken to the Calais CBP station.  Id.  A records check revealed Flores Salazar's July 2024 encounter with CBP upon his entry into the United States, and Flores Salazar notified the Calais agents that "he does fear persecution or torture if returned to Venezuela."  Id.  The CBP narrative of this March 5 encounter, however, does not document Flores Salazar's parole, stating instead that he was "in the United States illegally" and did "not possess immigration documents that would allow him to enter, remain in, or pass through the United States."  Id.  The Acting Patrol Agent in Charge at the Calais station authorized an arrest warrant, which accused Flores Salazar of being "within the country in violation of the immigration laws," Doc. No. 23-1 at 14, as well as a Notice of Custody Determination, which stated Flores Salazar would be detained "pending a final administrative determination in [his] case," id. at 15.[3]

On March 6, the day after his arrest, ICE's Enforcement and Removal Operations ("ERO") took custody of Flores Salazar and transported him to a correctional facility in Vermont.  Doc. No. 16-1 at 3.  Twelve days later, he was transferred to PCCF in Massachusetts, where he remained for more than seven weeks.  During his time at PCCF, Flores Salazar twice appeared in immigration court, but no representative of CBP or ICE reviewed or revisited his custody status.  See Doc. No. 16-1 at 3; Doc. No. 23-1 at 30.

---

[3] The record suggests the other men arrested with Flores Salazar also had work authorizations, which cannot be obtained from USCIS absent some form of permission to enter and remain in the country at least temporarily.  Witness testimony during the June 9, 2024, evidentiary hearing in this matter suggests neither ICE nor CBP has taken any steps to review the decisions to arrest and/or detain the other men, despite the admitted error that has come to light as a result of Flores Salazar's habeas petition.

Flores Salazar filed the federal habeas petition now pending before this Court on April 29, 2025, with the assistance of counsel. Doc. No. 1. He supported his petition with a sworn declaration, in which he described his parole into the United States and attested that the CBP officers he encountered on March 5 "told [him] that they were detaining [him] to check if [his] work permit and [S]ocial [S]ecurity number were fake." Doc. No. 1-1 at 4. Flores Salazar supported his petition and declaration with other exhibits, including a copy of his work-authorization card and notices reflecting the termination of his parole and subsequent revocation of his work authorization. Id. at 12, 14, 16. Both notices were issued in April 2024, more than a month after his arrest. Id. at 14, 16. In the petition, Flores Salazar alleged his detention violated the federal statute governing his parole and the Due Process Clause to the United States Constitution. Doc. No. 1 at 8–11. He sought immediate release from custody and an award of attorney's fees under the Equal Access to Justice Act. Id. at 11.

Because the petition and the accompanying declaration alleged Flores Salazar had been detained for nearly two months (at the time of filing) even though he had lawful, temporary permission to be present in the United States and had complied with all CBP directives from the moment he entered the country last July through his encounter with CBP officers in March, the Court promptly acted on the petition. In an Order filed later in the day on April 29, the Court directed the Clerk's Office to serve the petition, set a May 6 deadline for a response from the government, and required the government to provide seventy-two hours' notice before transferring Flores Salazar out of Massachusetts. Doc. No. 3 at 1, 3. The Clerk's Office sent notice of the Order via email to counsel for the government within ten minutes of its docketing. The record confirms that ICE received notice of the Court's Order on the day it issued. See Doc. No. 23-1 at 30.

Near the end of business hours on May 6, the response deadline, counsel for the government filed a motion requesting an extension of time, explaining the unit handling cases such as this one was "overwhelmed" and that "unfortunately this case slipped between the cracks." Doc. No. 5 at 1. The Court scheduled a hearing the next day, at which it explained to counsel the serious nature of the allegations raised by Flores Salazar and granted the government a brief extension, setting a new response deadline of May 9. Doc. No. 7. On May 8, the day after the hearing, the Assistant Field Office Director for ERO in Boston undertook a review of Flores Salazar's custody status—the first such review conducted by any representative of CBP or ICE since March 5. Doc. No. 16-1 at 1, 3. On May 9, counsel for the government requested a second extension of the response deadline, explaining that Flores Salazar was "being processed to be released within the next 24 hours." Doc. No. 8 at 1. The Court allowed the request and provided the government the extra week it sought. Doc. No. 9.

Flores Salazar was released from PCCF on May 10, after ERO "confirmed [he] was in parole status at the time of his March 5, 2025, arrest" and that his parole had not been revoked "at the time of his arrest." Doc. No. 16-1 at 3. But Flores Salazar was not simply and unconditionally released. He was fitted with an ankle bracelet and subject to GPS monitoring supervised by ICE. See id. at 2.

On May 16, the government moved to dismiss this action, suggesting Flores Salazar's release from PCCF rendered his habeas petition moot. Doc. No. 15. According to the government, he was "no longer in ICE custody" and could pursue any administrative challenges to his GPS monitoring in immigration court. Doc. No. 15-1 at 2–4. Though the government acknowledged that GPS monitoring can, in some circumstances, amount to "custody" for habeas purposes, it asserted this was not such a case. Id. at 4–5. The government represented in its

memorandum that Flores Salazar "is free to travel, determine where he wants to reside, associate with whomever, and pursue what employment he can engage in." Id. at 5.  This characterization is unsupported by any evidence, and it is wrong.

On May 23, the government submitted a pair of declarations addressing the basis for Flores Salazar's arrest and detention.  Doc. No. 16.  Both acknowledged his valid parole status on March 5.  Doc. No. 16-1 at 3; Doc. No. 16-2 at 2.  In one, ICE attributed ERO's acceptance of Flores Salazar for detention to "human error."  Doc. No. 16-1 at 3.  In the other, CBP stated that "administrative oversight" had caused its "unaware[ness] that [the] previously granted parole issued by" CBP in Texas "was still valid and in effect" at the time of Flores Salazar's arrest.  Doc. No. 16-2 at 2.  After reviewing these submissions, the Court directed the government to supplement its response to the petition with copies of the documents upon which the declarants had relied and certain other related reports.  Doc. No. 17.  This supplemental submission was due at 2 PM on May 30.  Id.  In the same Electronic Order, the Court scheduled a June 9 "in-person hearing on the Motion to Dismiss and the respondents' May 23 submission," with witness testimony.  Id.

Flores Salazar subsequently opposed the Motion to Dismiss, arguing, among other things, that the conditions of supervision placed on him upon his release from PCCF are sufficiently restrictive to establish that his "custody" has not ended.  Doc. No. 18 at 4–5.  He supported his memorandum with exhibits documenting the conditions he describes.  See Doc. No. 18-1.

The deadline for the government's supplemental submission came and went without the required filing and without a timely request for an extension.  After the Deputy Clerk inquired of counsel for the government, and two-and-one-half hours after the deadline had passed, the government finally sought an extension without offering any explanation for its failure to comply

with the Court's directive. Doc. No. 19. The Court extended the deadline to the next business day, Doc. No. 20, and the government made the required submission on June 2, Doc. No. 23.

On June 9, the Court held a hearing on the Motion to Dismiss and the issues raised by the Petition and highlighted by the Court concerning the basis for Flores Salazar's arrest and detention. Doc. No. 24. The ICE and CBP supervisors who signed the declarations the government had submitted were present. At the outset, the government asserted that, though it had arranged for the witnesses to appear and would offer their testimony to address the Court's concerns, Flores Salazar's release rendered the petition moot, stripped the Court of jurisdiction to proceed to the merits of his challenges, and eliminated any basis for Flores Salazar's lawyers to cross-examine the witnesses. The government essentially suggested it was producing the two declarants as a courtesy to the Court, and not because the proceedings required their testimony. When the Court pointed out that it had not resolved the Motion to Dismiss, which was a subject of the hearing, counsel for the government expressed surprise, saying he had not realized the hearing would concern that motion. After the Court read aloud from its Electronic Order scheduling the "hearing on the Motion to Dismiss," Doc. No. 17, counsel for the government stated he would "stand on the papers" on that motion and did not intend to offer any evidence.

The two witnesses then testified. First, the CBP official responded to questioning by counsel for both parties and the Court. The government then declined to question the ICE official, who offered briefer testimony in response to questioning by the Court and Flores Salazar's counsel. Salient details from the testimony will be incorporated as appropriate into the discussion sections that follow. After the witness testimony, the Court invited argument. Counsel for the government declined, but the Court heard argument from Flores Salazar's counsel on the pending motion and the merits of the petition. His counsel also argued that the

facts revealed during the hearing (including, for example, a revelation that there was body-camera footage of the March 5 encounter) warranted further discovery or proceedings. The government objected to further proceedings, saying it did not think there was any further information to be offered. The Court took the matter under advisement.

II.    DISCUSSION

    A.    Mootness

The government's only challenge to the Petition is an argument that Flores Salazar's May 10 release from PCCF renders it moot. Doc. No. 15. That position is eviscerated by law the government itself has cited, applied to the undisputed facts Flores Salazar has adduced.

This Court has jurisdiction to entertain and resolve petitions seeking habeas relief filed by "persons who are 'in custody in violation of the Constitution or laws or treaties of the United States.'" Ali v. Napolitano, No. 12-cv-11384-FDS, 2013 WL 3929788, at *2 (D. Mass. July 26, 2013) (quoting 28 U.S.C. § 2241(c)(3)); see Doc. No. 15-1 at 5 (quoting López López v. Charles, No. 20-cv-10145, 2020 WL 419598, at *3 (D. Mass. Jan. 26, 2020), including parenthetical language from Ali cited therein). It is well-settled that the "custody" requirement for federal habeas purposes is satisfied in various "circumstances short of incarceration." Ali, 2013 WL 3929788, at *3. In Ali, Chief Judge Saylor considered a similar argument that an immigration-related "order of supervision is not a sufficient restraint to satisfy the 'custody' requirement" for habeas purposes. Id. After careful and persuasive analysis, Chief Judge Saylor reasoned: "While the petitioner is 'free' in the sense that he is not behind prison walls, he is subject to control over where and when he can travel, where he can reside, with whom he can associate, what information he may keep confidential, and the type of employment in which he can engage." Id. at *4. Because such restraints on liberty are "not shared by the public generally," and "are substantially similar to those restraints identified in the criminal context warranting a

9

'custody' finding," Chief Judge Saylor concluded that they sufficed "to trigger the 'custody' bar required to invoke the writ of habeas corpus." Id. at *5.

The same is true here. Documents submitted by Flores Salazar and uncontested by the government establish (at least) the following restraints in this case. Upon his release from PCCF, Flores Salazar was fitted with an ankle bracelet containing a device that continuously tracks his location using GPS. Doc. No. 18-1 at 2, 19. Once released, Flores Salazar was required to travel to Texas and then report to the "nearest ICE office" on May 22 at 9 AM. Id. at 3. He must not remove the GPS monitor, must maintain and charge the monitor, must keep a related apparatus in his home and ensure electrical service, must permit inspections of the equipment both during ICE office visits and inside his home, must adhere to a weekly schedule approved by ICE, must not vary from his schedule absent approval of a request made twenty-four hours in advance, and must notify ICE of any medical or other emergencies by calling a hotline. Doc. No. 18-1 at 19. Flores Salazar's movement is limited to a designated geographic area within Texas, absent permission from ICE to travel elsewhere. Id. at 19, 21. He may not "drink excessively"; must disclose any work information to ICE; must provide ICE with "any information requested"; may be asked "to verify" his location "at any time . . . 24 hours a day[], seven days a week," and must respond to this and any other request for information "accurately and completely"; and he cannot change his address or telephone number without advance notice to, and approval from, ICE. Id. at 12. Every four weeks, he must visit an ICE office that is more than 170 miles from his home, and during such visits his "possessions or vehicles are subject to search." Id. at 13–14; see Doc. No. 18 at 4.

Plainly, these conditions substantially limit Flores Salazar's liberty and vastly exceed restraints experienced "by the public generally." The government altogether fails to engage with

any of these facts, let alone advance a meaningful, non-conclusory argument that would support a finding of mootness on this record.  The record establishes that Flores Salazar remains in "custody" for purposes of § 2241.  His petition is not moot.  The Motion to Dismiss (Doc. No. 15) is DENIED.

        One final point merits comment, though the government has not raised it expressly.  At the time Flores Salazar filed his petition, his immediate physical custodian was the named respondent (the Superintendent of PCCF).  Since his release on the conditions enumerated herein, his immediate custodian has changed.  At all relevant times, Flores Salazar's ultimate legal custodian has been ICE.  ICE decided to detain him, later placed him in the physical custody of PCCF's Superintendent, and eventually invoked an alternative to detention supervised through a different ICE program.  The changes to Flores Salazar's physical location and immediate custodian, procured by the government, do not deprive this Court of jurisdiction to hear and resolve the pending habeas petition.  Rather, "when the [g]overnment moves a habeas petitioner after []he properly files a petition naming h[is] immediate custodian, the District Court retains jurisdiction and may direct the writ to any respondent within its jurisdiction who has legal authority to effectuate the prisoner's release."  Rumsfeld v. Padilla, 542 U.S. 426, 440–41 (2004) (citing Ex parte Endo, 323 U.S. 283 (1944)).  Applying that principle here, the Court will direct the writ—to which Flores Salazar is entitled for reasons explained in the next section—to Patricia Hyde, Acting Director of ICE's Boston Field Office, and/or an ICE official who supervises Hyde and has the legal authority to effect Flores Salazar's release.

        B.    Merits

        Having resolved the government's threshold jurisdictional challenge, the Court proceeds to the merits of Flores Salazar's petition.  The government has advanced no written or oral

argument opposing the petition on its merits, as an alternative to its assertion of mootness.[4]

Nonetheless, the Court considers whether Flores Salazar has established, on the merits, an entitlement to the relief he seeks.

It is undisputed that Flores Salazar entered the United States at a time and in a location designated by CBP through a process established by the government for individuals seeking asylum. It is undisputed that this process involved an interview of Flores Salazar scheduled and conducted by CBP, and that the interview led CBP to grant Flores Salazar temporary parole for humanitarian reasons pursuant to a federal immigration statute. It is undisputed that, when he encountered CBP officers on March 5, Flores Salazar was present in the United States pursuant to that decision by CBP, and that his parole remained in full force and effect when CBP encountered, arrested, and detained him that day. It is undisputed that, on March 5, Flores Salazar possessed a valid, unexpired, government-issued work-authorization card bearing his photograph and various other personally identifying information. It is undisputed that Flores

---

[4] Besides asserting mootness, the government presented no written argument and no evidence in advance of the June 9 hearing aimed at demonstrating CBP acted lawfully when it detained Flores Salazar. Nor did the government present such argument or evidence at the hearing. Even after the Court made clear during the hearing that it intended to receive evidence and argument on both the Motion to Dismiss and the Petition, the government limited its oral argument to mootness. Counsel for the government declined to question one of the witnesses, then declined to make any argument after witness testimony concluded. The government sought no opportunity to make a written post-hearing submission addressing the lawfulness of Flores Salazar's detention, nor did the government ask the Court to schedule further briefing on the merits or development of the evidentiary record if dismissal were denied. Certainly, the government has offered no evidence or argument supporting a finding that wrongfully confining someone in jail for sixty-five days, and then placing them on intensive supervision that continues to impose significant restraints on their liberty for thirty more days and counting, is lawful. This course of conduct justifies a finding that the government has waived any possible merits argument available to it but not articulated to date, including any alternative basis for Flores Salazar's enduring detention. See Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1988) ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (cleaned up)). Thus, the Court finds the government has waived such arguments.

Salazar and his companions cooperated with the CBP agents who investigated their van on March 5. It is undisputed that Flores Salazar identified himself and produced a valid form of identification—his work-authorization card issued by USCIS—which conveyed on its face his USCIS number and the regulatory provision upon which the authorization was based.

CBP sought to confirm the information Flores Salazar provided, and the agents did so by transporting him back to their station and searching databases for information about his immigration status. It is undisputed that at least one database they searched documented Flores Salazar's July 2024 encounter with CBP in a narrative that concluded as follows: "Subject was processed for NTAs and paroled into the U.S. pending [an asylum] hearing." Doc. No. 23-1 at 26 (emphasis added). It is undisputed that CBP knew of Flores Salazar's parole on March 5. Cf. Doc. No. 16-2 at 2 ("Due to an administrative oversight, [CBP] was unaware that a previously granted parole . . . was still valid and in effect." (emphasis added)).[5] It is undisputed that CBP took no steps to revoke Flores Salazar's parole, or engage in any individualized redetermination with respect to it, on March 5 or at any time before CBP placed him in ICE custody the next day. In other words, it is undisputed that Flores Salazar had permission to be in the United States on March 5, that he had committed no crime, and that CBP knew these things when it detained him.

The record contains no evidence suggesting there was any other material change in Flores Salazar's circumstances that justified an individualized redetermination or revocation of his parole status on March 5. Nor is there any evidence establishing that such an individualized

---

[5] During the evidentiary hearing, the CBP supervisor familiar with this case testified that agents knew of the parole but mistakenly believed the NTA issued the same day during the same encounter by the same agent who granted parole for some reason immediately nullified the parole. This explanation is implausible in the circumstances, given the information contained in the database (which is part of the record here) as well as the Court's evaluation of the testimony at the hearing, and the Court does not credit it.

redetermination or revocation was undertaken by CBP then, or at any time thereafter.[6]  What the record shows is that CBP granted Flores Salazar temporary parole that permitted him to enter the United States in July 2024 and remain for two years, and that his parole was in effect on March 5.  These facts were apparent in CBP's own databases on March 5, and those databases were reviewed by CBP agents on that date.  Thus, the Court finds the agents knew these facts on that date.  Despite knowing these facts, CBP: 1) documented the March 5 encounter in a narrative that characterized database searches as having confirmed that Flores Salazar was "in the United States illegally" and lacked "immigration documents that would allow him to enter" or "remain in . . . the United States," Doc. No. 23-1 at 23; 2) issued an arrest warrant stating Flores Salazar was "within the country in violation of the immigration laws," id. at 14; and 3) processed Flores Salazar for detention pursuant to a statutory provision that did not apply to him, compare id. at 24 (invoking "Section 212(a)(6)(A)(i)"), with 8 U.S.C. § 1182(a)(6)(A)(i) (applicable to noncitizens "present in the United States without being admitted or paroled" (emphasis added)).  None of these actions or statements were supported by the facts or the law.

       Put simply, the evidence overwhelmingly establishes, including through concessions by CBP and ICE, that Flores Salazar was detained without any lawful basis.  Though he is no longer

---

[6] The CBP supervisor testified that the "oversight" here had a simple fix: Agents should have revoked Flores Salazar's parole via a three-sentence letter at the time of his arrest.  However, the supervisor could neither identify nor describe any official guidance in place at that time calling for such revocation, he was unaware of the basis upon which one of his subordinates decided to detain Flores Salazar (apart from the erroneous statement that his presence in the United States was unauthorized), and he cited nothing about Flores Salazar as an individual that justified revocation or detention at that time.  Of course, CBP cannot lawfully revoke parole it has granted absent any reason whatsoever.  The Court rejects the notion that the "mistake" here was a mere failure to issue a form.  The undisputed evidence establishes that no one acting on behalf of CBP revoked or even evaluated Flores Salazar's parole on March 5.  No one acting on behalf of CBP considered or identified a reason to revoke his parole that day (or the next day, before his transfer to ICE custody).  And no categorical decision or policy was in place at that time pursuant to which Flores Salazar's parole was subject to revocation.

imprisoned, he remains in custody as a result of the March 5 "error" or "oversight."  On this record, Flores Salazar is entitled to release.

### III.    CONCLUSION

In sum, because Flores Salazar continues to experience substantial limitations on his liberty, his petition is not moot.  The respondent's Motion to Dismiss (Doc. No. 15) is DENIED.  Because the record establishes that the restraints on Flores Salazar's liberty did not exist before March 5, 2025, and would not exist but for his unlawful arrest on that date, he is entitled to an order mandating his release from those restraints.  His Petition (Doc. No. 1) is ALLOWED.  Patricia Hyde, Acting Director of ICE's Boston Field Office, and/or an ICE official who supervises her and has the legal authority to carry out this Order, shall RELEASE Flores Salazar from GPS monitoring and intensive supervision FORTHWITH.  The government shall file a notice by Friday, June 13, 2025, certifying that it has complied with this Order.  It is further ORDERED that neither ICE nor any other government agency shall retaliate against Flores Salazar for filing this habeas petition and/or securing relief.

In addition, the government shall SHOW CAUSE within ten days of this Order why Flores Salazar is not entitled to an award of reasonable fees and costs as a "prevailing party" under the Equal Access to Justice Act, 28 U.S.C. § 2412.  See Doc. No. 1 at 11 (requesting such an award); Doc. No. 13 at 2 (reiterating intent to file petition for fees).  Flores Salazar may respond to the government's submission within ten days of its filing and shall include with his response an itemization of the fees and costs he seeks.  The government may reply within seven

days of Flores Salazar's submission and may include in its reply any objection to the reasonableness or basis of the amount(s) requested.

                        SO ORDERED.

                        /s/ Leo T. Sorokin
                        United States District Judge